MIDDLETON *v.* WATKINS HARDWARE COMPANY.

4-5052

Opinion delivered May 2, 1938.

*W. N. Martin, J. F. Quillin* and *Hal L. Norwood,* for appellant.

*Minor. Pipkin* and *Howard Hasting,* for appellee.

GRIFFIN SMITH, C. J. November 15, 1935, J. W. Middleton, Sr., filed with the clerk of the circuit court of Polk county the following statement:

"J. W. Middleton, Jr., in account with J. W. Middleton, Sr., August 26, 1935. To cash advanced and used

in erecting, building and equipping Hotel Middleton in city of Mena, Arkansas [legal description of property] . . . $2,000.''

The affidavit was: ''I . . . do solemnly swear that the above and foregoing account is for money advanced to the above named debtor and used in paying for materials used in erecting, building and improving the building known as the Hotel Middleton; . . . that said moneys were actually furnished and used for the said purpose from time to time, the last item being had on the 26th day of August, 1935. . . .''

February 1, 1937, suit was filed in chancery court, and March 9, 1937, judgment on the account was rendered and a lien declared on the property involved, with decree of foreclosure. The commissioner's sale was had September 4 of the same year, and the $2,000 bid of the plaintiff was thereafter confirmed.

December 12, 1935, J. W. Middleton, Jr., delivered to Watkins Hardware Company his promissory note for $4,650.67, payable $150 per month, beginning February 1, 1936. The note was secured by a mortgage on Hotel Middleton properties. It was recorded four days after execution.

April 12, 1937, the Watkins Hardware Company filed suit to foreclose, alleging that only $492.02 had been paid.

In answer to the Watkins suit, Middleton, Sr., pleaded the decree of March 9, sale of the property thereunder, and his purchase at the commissioner's sale.

The decree, and the proceedings under which appellant claims, date back to the chancellorship of Hon. Pratt P. Bacon, now deceased, who was succeeded by Hon. A. P. Steel. In rendering his decree in the suit of Watkins Hardware Company v. J. W. Middleton, Sr., from which this appeal comes, Judge Steel found that at the time appellant filed his suit under the lien he claimed, appellee Watkins Hardware Company had an interest in the property, but was not made a party. Therefore, appellee was not bound by the decree. The court also found that, as against the Hardware Company, Middleton was not entitled to a lien ''. . . for money advanced for use

in paying for materials which were used in the construction of the hotel; that the account and affidavit filed by said Middleton were insufficient to establish or preserve a lien for any purpose, and that whatever right, title, claim or interest he may have in the property is inferior and subject to the lien of plaintiff's mortgage."

Judgment for $5,139.16 was rendered against Middleton, Jr., and the property ordered sold.

It is urged that appellee is estopped to assert that its claim is superior to that of appellant. It is also urged that the decree in the case of *Middleton* v. *Middleton* was conclusive as to the lien, and that appellee's suit is a collateral attack on the judgment.

Middleton admitted execution of the $4,650.67 note, and the mortgage. In substance his testimony was that in 1934 he undertook to build the hotel, but it was never completed. "The note given Watkins Hardware Company was for materials for which the company had filed a lien. The fifteen months [within which an action to foreclose the lien must be brought, § 8888, Pope's Digest] was about up, and I gave the mortgage. I don't know when the lien was filed, but do know there was a lien, and the note and mortgage were given to cover the indebtedness I owed. At the time the mortgage was executed the hotel was still under construction. Subsequent to that time the Watkins Hardware Company furnished materials, but only what we paid for. At the time the mortgage was given J. W. Middleton, Sr., was financing the construction. I furnished the first $3,500 worth of stuff that went in there and the Watkins Hardware Company furnished from there on. They [Ed Watkins] said they were not in a position to go any further; that they had checked up and found they were having a lot of other things that would have to be financed and cause them to be depressed, and for me to see if I could get anyone to finish it. I said, 'Under the circumstances it will be difficult. I cannot get a loan because you have a claim for the amount you have already furnished—the building is not any good the way it is.' Ed Watkins said, 'No, it is not.' I said, 'It will not stand up without par-

titions, and it is dangerous.' He said, 'See if you can get anyone to finish it. We are willing to wait on our money if you can get the building finished.'

"I couldn't even get anyone to talk to me about it. It looked like a bad proposition for me, and also for them. The security was no good and my investment was no good. I went to J. W. Middleton, Sr., and asked if he could help me. He said: 'I can't do much. If you will furnish the labor I will furnish the materials'; and I said, 'I will pay you first on that.' Ed told me they were willing to wait for their money if I could get it finished."

"Q. And the material for which he [appellant] filed a lien: is that the same material he furnished during this period of time? A. Not all of it. He furnished more than $2,000; he furnished about $2,700. Probably $1,500 came from the Watkins Hardware Company. We were doing our own labor with just a little help. I would call up and estimate how much I would need for the next day and I would tell my father and he would tell me to order the stuff. He sometimes ordered lumber from Pete Davis, and Pete would go to the house and get the money. He would come by the liquor store at the hotel and find out what the bill was and what I was going to need to pay for the materials, and he would give it to the boy keeping the books and tell him to be sure it went for that material. We were, of course, a little careless about handling his money. After filing of the Watkins lien, or perhaps two months previous, no credit was extended; it was cash on delivery. When the materials were sent up my father paid for them. That was the case with all the people from whom I ordered. Several times I gave a list of the things I wanted and [my father] got them.

"Q. Your father wasn't building any hotel, was he? A. He was then.

"Q. He was furnishing the money to you, was he not? A. No, sir. He was very strict, and said he was not going to loan me any money. He paid for the materials I got. We told him what we needed and he paid

for it when it came. . . . Sometimes I ordered, and sometimes he came on the job and the workmen would tell him what they wanted, and he would order it. I made the agreement [with my father] that I would find out what material I needed and he would pay for it. I looked to my father for the materials. . . . I haven't any of the bills that were made out for the lumber and things.''

The right to the lien claimed by each party to this record is that which arises under § 8865 of Pope's Digest: ''Every mechanic, builder, artisan, workman, laborer, or other person, who shall do or perform any work upon or furnish any material, fixtures, engine, boiler, or machinery for any building, erection, improvement upon land, or upon any boat or vessel of any kind, or for repairing same, under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor, upon complying with the provisions of this act, shall have for his work or labor done, or materials, fixtures, engine, boiler or machinery furnished, a lien upon such building, erection or improvement, and upon the land belonging to such owner or proprietor . . . The lien herein given shall be transferable and assignable, but it shall not be enforced against the owner or proprietor of the ground or buildings unless such owner or proprietor shall have actual notice of such assignment so as to protect himself. [§ 8866.] In all suits under this act, the parties to the contract and all other persons interested in the controversy, and in the property charged with the lien, may be made parties; but such as are not made parties shall not be bound by any such proceedings.'' [§ 8890.]

The rule announced in 40 C. J., p. 77, § 56, and in 18 R. C. L., p. 925, § 55, is: ''There can be no mechanic's lien for money loaned or advanced to a contractor or other person for the purchase of material for, or pay for labor upon, a building or other improvement, nor can a lien be had as security in favor of one who lends his credit to another to enable him to purchase materials.''

In *Valley Pine Lumber Company* v. *Hodgens,* 80 Ark. 516, 97 S. W. 682, we said: "He [appellee] paid the laborers whom he hired to assist him, and his counsel contends that, as these laborers had liens, the plaintiff had the right to pay them and enforce their liens against the property. In other words, that he would be treated in equity as the assignee of their liens to the extent of his debt. . . . The statute as written gives the lien to the one who performs the labor, and not to the one who hires labor performed and pays for it. Nor did this payment operate as an assignment of the lien of the laborer whose debt was paid. When Hodgens paid the laborers whom he hired to assist him, he discharged a debt which he owed, and his payment did not operate as an assignment to him of the lien held by the laborer for his debt. The effect of the payment was to extinguish both the debt and the lien."

Again, it was said: "A mechanic's lien exists only by statute, and, the power to obtain a lien being given by the statute, no one can obtain a lien unless he comes within the provisions of the statute." *Royal Theatre Co.* v. *Collins,* 102 Ark. 539, 144 S. W. 919.

In *Superior Lumber Company* v. *National Bank of Commerce,* 176 Ark. 300, 2 S. W. 2d 1093, Chief Justice HART, speaking for the court, said: "The lien for materials is purely a creature of statute, and, while it is assignable under our statute, the right to prosecute a mechanic's lien is not assignable. Such liens must be perfected before they can be transferred or assigned. *Young Men's Building Association* v. *Ware,* 158 Ark. 137, 249 S. W. 545."

Appellant relies upon *Twist* v. *Roane,* 174 Ark. 35, 294 S. W. 62, in which it was said: "We think one who buys materials on his own account and furnishes them to a contractor to build a house for another, even if delivered by the original vendor directly to the contractor at his request, from time to time, is entitled to a materialman's lien under the statute, and is in no sense a mere guarantor of the account."

The facts in the Twist case must be known in order to understand the holding of the court. Appellants (Twist Bros.) were lumber dealers domiciled in a foreign state, but owning plantations in Arkansas. Appellee (Roane) was a contractor and carpenter. Appellants engaged appellee to build a house for them. At the same time appellee had a contract to building a house for other parties. Because of their business connections appellants were in a position to purchase materials at wholesale prices in Memphis, and by agreement with appellee orders were sent to the Cole Manufacturing Company. All materials used in the construction of both houses bought from the Cole Company were charged to appellants and paid for by them. The question determined was that appellants had a materialman's lien for the supplies they purchased which went into the house built for the third parties. Effect of the decision was to hold that Twist Bros. supplied the materials, and were therefore entitled to a lien.

It is earnestly urged by appellant that appellee had entered into a contract with the younger Middleton to supply all materials for the hotel, and that such contract was breached. The testimony does not show that the contract was to this effect. The younger Middleton testified: "I furnished the first $3,500 worth of stuff that went in there and the Watkins Hardware Company furnished [not *was to furnish*] from there on." There is not even an allegation of a contract to furnish *all* the materials needed. Nor does the witness say that Ed Watkins agreed the elder Middleton should have preferential consideration. The statement was: "See if you can get some one to furnish it. We are willing to wait on our money if you can get the building finished."

The hotel never was completely finished; and, if it be urged that the waiver claimed in appellant's behalf contemplated that appellant's lien should have priority, still, the offer made by Watkins was conditional upon an arrangement whereby the hotel would be completed.

The conversation referred to by young Middleton occurred in early December, 1935, prior to the mortgage.

After the mortgage and notes had been executed, only $492.02 was paid before suit to foreclose was filed, although installments agreed upon were $150 per month from February 1, 1936. In other words, while $2,155 in principal alone was accruing to April 12, 1937, $492.02 was paid. At the expiration of fourteen months and eleven days of waiting by appellee, the default amounted to $1,662.98, exclusive of interest—an amount almost equal to the sum appellant claims as his preference.

Of course, failure of young Middleton to meet his obligations to appellee did not affect appellant's rights in the controversy. But it does shed light upon the relationship of the parties and circumstances attending the transactions.

It is our view that appellant (who did not testify) has not, through the testimony of his son as the sole material witness, established that there was a contract with appellee to supply materials sufficient to complete the hotel. Nor is such testimony sufficient to show that appellee agreed to subordinate its lien to that of a then unknown party for an unnamed amount. Therefore there was no estoppel.

When appellant filed suit (in consequence of which Chancellor Bacon declared a lien), he was charged with knowledge of appellee's mortgage—a matter of record. Not having made appellee a party to such suit, appellee is not bound by the judgment and decree. [Pope's Digest, § 8890.]

This is not a collateral attack. It is a proceeding by appellee to foreclose a mortgage which is prior in point of time to the assertion by the appellant of his lien by the action in chancery. In an effort to defeat the mortgage, appellant pleads his judgment and decree, and in effect asks that a prior mortgagee be bound by the adjudication in a suit to which it was not a party.

The decree [of March 9, 1937] in appellant's favor, after setting out in full the account, and affidavit filed therewith, found that Middleton was entitled to $2,000 . . . "for materials furnished and used by the defendant." It also found that "The cause was submitted upon

the complaint with its exhibits ... *and evidence adduced before the court.''* [Italics supplied.]

But for the priority of appellee's mortgage and the protection afforded by § 8890 of Pope's Digest, it would be presumed that, with respect to appellant's judgment, ''evidence adduced before the court'' was sufficient to overcome the defects urged—defects which, in the absence of testimony explaining them away, would defeat the lien. We do not pass upon the question whether, as between parity lienors, a decree similar to the one in question would bar valid claimants who had complied with § 8881 of Pope's Digest, and who as against a rival claimant situated as appellant was, undertook to question collaterally a decree sustaining the lien.

But, as stated *supra,* in the instant case appellee does not question the decree either directly or collaterally, but only insists that it cannot be prejudiced by the action taken. A majority of the judges concur in this view.

Affirmed.

HUMPHREYS, MEHAFFY and DONHAM, JJ., dissent.